```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
```

**Richard M. Nault**

    **v.**                                        Civil No. 04-cv-479-PB
                                                            Opinion No. 2007 DNH 020

**United States of America**


## MEMORANDUM AND ORDER

    Richard Nault brings this action against the United States to recover income tax refunds for several tax years. Nault's claims stem from investments he made in several agriculture-based limited partnerships (collectively the "AMCOR Partnerships"). In 2001, the tax court entered orders resolving a claim by the United States that the AMCOR Partnerships were sham transactions lacking economic substance. The parties agree that Nault's entitlement to the refunds he now seeks depends upon the meaning and legal effect of the tax court orders.

    The matter is before me on cross motions for summary judgment.

# I. BACKGROUND

This case falls within the purview of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). Accordingly, I begin by explaining TEFRA's legal framework. I then describe Nault's investments in the AMCOR Partnerships and the tax court litigation challenging the legitimacy of the partnerships' tax returns.

## A. The TEFRA Framework[1]

TEFRA establishes a "single unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level." Callaway, 231 F.3d at 108. Whether an item is a partnership item or a nonpartnership item is the threshold inquiry under TEFRA. Id. Partnership items are "subject to TEFRA's centralized audit procedures," while "the treatment of nonpartnership items is determined at the level of the individual partner's return . . . ." Id. Under TEFRA, taxpayers are not "permitted to raise

---

[1] In Callaway v. Comm'r, the Second Circuit provided a thorough and enlightening explanation of TEFRA. See 231 F.3d 106, 107-12 (2d Cir. 2000). I rely heavily on Callaway in explaining TEFRA's legal framework.

nonpartnership items in the course of a partnership proceeding." Id. Correlatively, taxpayers cannot raise partnership items at partner level proceedings. Id.

TEFRA further mandates that a partner file "an income tax return that is consistent with the partnership return." Id. "The partner's distributive share of any partnership item must be reported in the same manner as on the partnership's information return (i.e., it must have the same amount, the same characterization, the same timing)." Id. at 108-09 (citations omitted).

"The [Internal Revenue Service ("IRS")] may adjust partnership items only at the partnership level and only after following TEFRA procedures." Id. at 109. Specifically, "[t]o audit a partnership return, the IRS must send notice of the beginning of an administrative proceeding ('NBAP') to the partners entitled to notice (the 'notice partners')."[2] Id.

---

[2] A notice partner is "a partner entitled to notice under section 6223(a)." Id. (citing I.R.C. § 6231(a)(8)). "When a partnership has 100 or more partners, a notice partner is generally one who owns at least a one percent interest in the partnership." Id. (citing I.R.C. § 6223(b)(1)). It is unclear from the record whether Nault was a notice partner in any of the AMCOR Partnerships.

"[A]ny partner has the right to participate in any administrative proceeding relating to the determination of partnership items at the partnership level." Id. (citing I.R.C. § 6224(a)). "[I]f after completing its audit the IRS adjusts the partnership return, it must send the notice partners a notice of final partnership administrative adjustment ('FPAA')." Id. (citing I.R.C. § 6223(a)(2), (d)(2)).

"Within 90 days of the date the IRS mails the FPAA notice, the partnership's 'tax matters partner' (TMP)[3] may contest the FPAA by filing a petition for readjustment in Tax Court, the Court of Federal Claims or the appropriate federal district court." Id. (citing I.R.C. § 6226(a)). "If the TMP does not file a petition within this period, then any notice partner may file a petition for readjustment within the next 60 days. Id. (citing I.R.C. § 6226(b)(1)). "Regardless whether the petition for judicial readjustment is filed by the TMP or by a notice partner, all other partners are treated as parties to the suit,

---

[3] The TMP is "the general partner designated in the partnership agreement to handle tax matters." Id. (citing I.R.C. § 6231(a)(7)).

provided that they have an ongoing interest in the outcome of the proceedings.  Id. (citing I.R.C. § 6226(c), (d)).  "In this manner TEFRA allows all partners, if they choose, to litigate a dispute with the IRS in a single proceeding that binds all."  Id.

"After the FPAA adjustments become final (i.e., after they go unchallenged for 150 days or are judicially resolved in a section 6226 [tax court, district court, or Court of Federal Claims proceeding]), the IRS may assess partners with the tax which properly accounts for their distributive share of the adjusted partnership items, without notice, as a computational adjustment."  Id. at 109-10 (citing I.R.C. §§ 6225(a), 6230(a)(1), 6231(a)(6)).  "In certain cases, where no further factual determinations are necessary at the partner level, an assessment attributable to an 'affected item' may also be made by computational adjustment."  Id. at 110.  An "affected item" is "any item to the extent such item is affected by a partnership item.  Id.  In the event of an unfavorable court decision, the TMP, a notice partner, or a 5-percent group make seek appellate review in the appropriate forum.  I.R.C. § 6226(g).

**B.    Tax Treatment of Nault's Investments**[4]

Nault invested in the AMCOR Partnerships between 1984 and 1986. Each partnership reported significant losses in its first year of existence and comparatively smaller amounts of income in subsequent years. Nault took deductions based on his distributive share of partnership losses and paid taxes on his share of partnership income disbursements throughout the course of his investments.[5]

In 1987, the IRS examined the AMCOR Partnerships' tax returns and issued FPAA notices disallowing deductions claimed by each partnership. In the FPAA notices, the IRS explained that the adjustments resulted from, inter alia, an IRS determination that the AMCOR Partnerships' activities constituted a series of sham transactions lacking economic substance.

---

[4] The facts in this section are drawn from the parties' Joint Statement of Background Facts and Background Discussion of Law Regarding Taxation of Partnership Interests (Doc. No. 31) and certain exhibits in the summary judgment record. The record is construed in the light most favorable to Nault.

[5] Nault's reported income and loss amounts for the AMCOR Partnerships are represented in a chart appended to the parties' Joint Statement of Background Facts. A copy of the chart is included with this Memorandum and Order as Appendix A.

Following the issuance of the FPAA notices, certain AMCOR partners--not including the TMP--filed Petitions for Readjustment of Partnership Items in the United States Tax Court pursuant to I.R.C. § 6226.  In July 1999, the TMP for each AMCOR Partnership intervened in each AMCOR tax court proceeding.

In 2001, after years of litigation, the IRS and the TMP entered into an agreement providing that the IRS would disallow approximately 72 percent of the AMCOR Partnerships' losses but allow the partnerships to retain all of their claimed Investment Tax Credits.  The agreement also provided that the AMCOR partners would not file amended returns restating any reported income from the AMCOR Partnerships on which they had already paid income taxes.

The IRS ultimately filed Motions for Entry of Decision in the tax court, and the tax court entered decisions with respect to each AMCOR Partnership reflecting the terms of the settlement agreement.  Each of the tax court decisions contained the following language:

> ORDERED AND DECIDED: . . . [t]hat the foregoing adjustments to partnership income and expenses are attributable to transactions which lacked economic

>    substance, as described in former I.R.C. §
>    6621(c)(3)(A)(v), so as to result in a substantial
>    distortion of income and expenses . . . .

After the tax court litigation was resolved, the IRS issued adjustments to Nault's 1984, 1985, and 1986 income tax returns based on the disallowed deductions.  Nault then paid the additional taxes resulting from the adjustments.

While the tax court litigation was ongoing, each of the AMCOR Partnerships terminated.  Nault had no remaining basis in his partnership interests when the partnerships terminated apart from any "restored" basis he might be entitled to claim based upon the tax court's disallowance of his prior deductions.

In September 2002, Nault sought tax refunds by filing amended federal income tax returns for 1995, 1996, 1998, 1999, 2000, and 2001.  In the amended returns, Nault claimed an ordinary loss deduction in the year each partnership terminated as well as carryover adjustments for other years affected by the termination year losses.  Along with his refund claims, Nault attached statements explaining why he was entitled to the refunds.  Specifically, Nault asserted that the Tax Court's 2001 disallowance of 72 percent of the AMCOR Partnership deductions--and derivatively, his share of the deductions--resulted in a

-8-

restoration of his basis in those partnerships by corresponding amounts. As a result of this adjustment to his basis, he argued, he was entitled to loss deductions in the exact amount of his previously disallowed deductions because the partnerships became worthless upon termination.

On December 18, 2002, the IRS denied Nault's refund claims. Nault timely filed this action on December 17, 2004.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

### III.  **ANALYSIS**

In claiming a loss deduction, Nault relies upon 26 U.S.C. § 165(a), which permits individuals to take tax deductions for losses "not compensated for by insurance or otherwise."  Another statutory provision--26 U.S.C. § 165(c)--adds important limitations to such deductions.  It provides:

> In the case of an individual, the deduction under subsection (a) shall be limited to--
>
> (1) losses incurred in a trade or business;
>
> (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and
>
> (3) except as provided in subsection (h), losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

Nault does not allege that he was involved in a trade or business in connection with the AMCOR Partnerships.  Nor does he allege that his losses arose from fire, storm, shipwreck, or other casualty.  Thus, Nault's claimed loss deductions can only be grounded in § 165(c)(2): "a loss incurred in a transaction entered into for profit."

A taxpayer is not entitled to loss deductions pursuant to § 165(c)(2) if his claimed losses stem from transactions that lack economic substance.  See Iles v. C.I.R., 982 F.2d 163, 165 (6th Cir. 1992).  Moreover, "when a taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance."  Coltec Industries, Inc. v. United States, 454 F.3d 1340, 1355 (Fed. Cir. 2006).  The government relies on these accepted principles in contending that Nault is not entitled to the deductions he seeks because, it argues, the tax court determined that the transactions on which Nault's deductions are based lacked economic substance.

Nault recognizes that he is not entitled to take deductions pursuant to § 165(c)(2) unless he can establish that his claimed losses are attributable to transactions that had economic substance.  He also agrees that the tax court orders are determinative on this issue.  Thus, this case turns on how the tax court orders are construed.

The government offers a straightforward interpretation of the tax court orders.  Its position is that the parties to the tax court proceeding settled their dispute by agreeing to the entry of court orders recognizing that the losses disallowed

-11-

pursuant to the orders were "attributable to transactions which lacked economic substance."  Because the orders clearly provide that the transactions on which Nault's claims are based lacked economic substance, the government argues, Nault cannot rely on the disallowed losses to "restore" his basis in his investments.

Nault focuses on the effect of the court orders rather than their specific terms in arguing that the tax court actually determined that the AMCOR Partnerships had economic substance.  In making this argument, Nault relies primarily on the basic principle that "a transaction that lacks economic substance simply is not recognized for federal taxation purposes, for better or worse . . . ."  ACM P'ships v. Comm'r of Internal Revenue, 157 F.3d 231, 261 (3d Cir. 1998) (citation and internal quotation marks omitted).  He then reasons that if the tax court acted consistently with this principle, it must have determined that the AMCOR Partnerships had economic substance because the court allowed partners to retain their Investment Tax Credits and a portion of their partnership's losses and because the settlement agreement that gave rise to the orders barred partners from filing amended returns restating any reported income generated by the partnerships.

I am not convinced that courts are required to apply the economic substance doctrine in quite so inflexible a manner as Nault suggests. However, I need not delve into this complex issue to resolve this case because Nault fails to appreciate the significance of the fact that the orders on which his claims depend were issued pursuant to a settlement. The government argued in the tax court proceeding that the AMCOR Partnerships were sham transactions that were completely lacking in economic substance. The TMP disagreed. After extensive litigation, the parties compromised their claims by settlement and, in so doing, they agreed to the precise language that was used in the court orders that resolved the parties' dispute. That language plainly provides that the disallowed losses on which Nault's current claims are based were attributable to transactions that lacked economic substance. It is unsurprising and ultimately insignificant for our purposes that the settlement also represented something less than a complete victory for either side. All that matters here is that the settlement resulted in the issuance of court orders that plainly resolved the issue that is now before the court.

Accordingly, I hold that the tax court decisions determined that the disallowed deductions were attributable to transactions that lacked economic substance. Those decisions are binding on Nault in this proceeding. Thus, Nault has no claim to loss deductions resulting from a restored basis because transactions lacking economic substance cannot give rise to losses under § 165(c).

### IV. **CONCLUSION**

For the reasons set forth herein, I grant the government's motion for summary judgment (Doc. No. 34) and deny Nault's cross-motion for summary judgment (Doc. No. 43). The clerk is instructed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro  
Paul Barbadoro  
United States District Judge

February 9, 2007

cc: Robert Lucic, Esq.  
    Courtney H.G. Herz, Esq.  
    Heather Richtarcsik, Esq.